Rockingham,
No. 6061.

AARON KALMAN

*v.*

PHILO A. HUTCHESON & *a.*

February 26, 1971

*Aaron Kalman,* pro se and *Sumner F. Kalman,* attorney-in-fact ( *Sumner F. Kalman* by brief and orally ), for the plaintiff.

*Frederick W. Murdock, Jr.,* of Massachusetts, for defendant Philo A. Hutcheson and *Shute, Engle & Frasier,* for the defendants Philo A. Hutcheson and Henry A. Hubbard.

PER CURIAM. This is a petition by the plaintiff seeking an order that the defendants remove certain obstructions to the flow of a brook and that he be awarded damages. The defendant Hubbard filed an answer requesting that the plaintiff's petition be denied, that he be ordered to remove a fence allegedly on the defendant's land, and for other relief. The defendant Hutcheson also filed an answer asking that the plaintiff's petition be denied and for additional relief.

The Master who heard the case ( *Leonard C. Hardwick,* Esq. ), after taking a view, returned a report in favor of the defendants with certain recommendations which hereinafter appear. This was approved by *Morris,* J. Later the plaintiff filed " objections " to the report. On review, the master recommended that the objections be disallowed. This recommendation was also approved by *Morris,* J. The salient features of the report follow:

"Since some period in the early part of the 19th Century, Betty Brook and / or Mill Brook have been obstructed by dams, thus causing the water to overflow an area and form Mill Pond. Two mills, one a lumber mill and the other a grist mill, were constructed and in operation at the dam sites. At least one of these mills continued in operation until 1933-1935. Up until 1956, the dams maintained the Pond at a higher level than that presently existing.

"By three separate conveyances Maurice A. Clark and Angie L. Clark acquired title from predecessors in title to land bordering on the Pond, including the dam sites, 'flowage rights and privileges,' 'all water rights and all mill rights in and to said Mill Pond.' One of the conveyances was made on condition that the grantees would 'repair the dam to the Mill Pond within one year from the date hereof.' [ See Plaintiff's #9-D ]. By virtue of these conveyances the Clarks obtained the right to flow the lands to the extent that the dams then in existence backed up the water. Thus the deeds conveyed more than the mere actual mills and dam rights. They conveyed an easement to flow lands. That easement was not terminated by the discontinuance of the use of the water for the operation of mills situate at the dam sites. Shortly after the Clarks received title, they repaired the dams and maintained them and controlled the flow of the brook until 1956. There was no evidence that up until 1956 there was any question raised as to the right of the Clarks or others to maintain the dams to a height that continued the previous high level of the Mill Pond.

"On August 16, 1945, the plaintiff acquired title on the southerly side of the Pond. At that time the water level of the Pond was higher than that presently existing, and the plaintiff took title with knowledge of the then existing level of the Pond. His deed described his tract in part as, 'to the high water mark at the mill pond; thence Westerly by the high water mark of said Mill Pond to land formerly of Annie Stuart.' It is clear from this description that the plaintiff by this deed acquired no interest in the land beneath the Pond.

"In 1956 a portion of the dam was washed out, and as a result, the level of the Pond was lowered, — to what level the Master is unable to determine from the evidence. The Pond was not entirely eliminated, but it was reduced in size.

"On December 17, 1962, the plaintiff purchased two other

tracts of land in the vicinity of the Pond. At the time of this purchase he had knowledge of the level of the Pond prior to 1956. One of these tracts was described in the deed of conveyance in part as, 'thence running . . . to the Pond; thence turning and running generally westerly along the Northerly side of said Pond . . .' This tract is on the opposite side of the easterly portion of the Pond to the tract he had purchased on August 16, 1945. At the time of the conveyance Mill Pond existed as such as the Brook was sufficiently obstructed to result in there being a backup of water. The Master is unable to find from the evidence as to how the level of the water compared to the presently existing level.

"On some course Mill Brook or Betty Brook, a natural stream, runs through the area of the Mill Pond. It is the contention of the plaintiff that his title carries to the center of the Pond. However, one of the plaintiff's deeds very specifically only runs to the high water mark of the Pond. In addition, the principle that a mention of a body of water as a boundary carries title to the middle of the body applies only in case the grantor of the claimant actually owns to the middle of the body. Title in the present case could have been carried back to a period when the Mill Pond did not exist, and title to that portion under water could have been established. This was not done.

"The Master finds and rules that the plaintiff has failed to meet his burden of proving title to any of the submerged land.

"But even if the plaintiff had been able to establish title, he has no cause for relief or damages, if in fact there existed a right to flow his land.

"On August 11, 1967, Maurice A. Clark deeded to defendant Philo A. Hutcheson and others his properties in the vicinity of the Mill Pond, 'together with such flowage rights, water rights, mill rights, and privileges as may be appurtenant' to the conveyed property. The grantees of the deed thus acquired the rights of flowage previously held by Clark. On April 15, 1968, the grantees of Clark, including defendant Hutcheson, leased the same premises and the same rights and privileges they had acquired under the deed to Henry A. Hubbard.

"Hubbard desired to develop the premises for a beach and picnic area. For such purposes, it was desirable that the water level of the Pond be raised. He filed with the New Hampshire Water Resource Board a Statement of Intent to reconstruct the

dam at the mill site. The Statement was granted by the Board. However, the granting of the Statement neither increased nor decreased any rights of flowage that then existed. Hubbard tore out the remains of the old dam or obstruction to the stream's flow and erected a new dam. This dam did not result in the raising of the water level of the Pond above that which existed before the old dam's washout in 1956.

" Defendant Hutcheson, neither actively or by way of abetting or aiding, did not in any way participate in the Hubbard project. He at no time participated in any activity that either raised or lowered the water level of the Pond. As one of the lessors, he is not responsible for the acts of the tenant Hubbard.

" The washout of the dam in 1956 resulted in a lowering of the level of the Pond. But to the extent that this resulted in a nonuse of the full flowage rights, it does not constitute such an abandonment as to extinguish any flowage rights.

" The Master finds and rules that Hubbard had a legal right to construct the dam as it was constructed and possessed a right of easement to flow the lands that were covered by the backup from the dam. The Master finds and rules that if the plaintiff acquired any title to land presently under the water of the Pond, he acquired them subject to the right of flowage which presently vests in Hubbard.

" The plaintiff has constructed a fence upon land, title to which is in defendant Hutcheson and others and which is included in defendant Hubbard's lease. This constitutes a trespass.

" The Master is unable from the evidence to make any finding as to the full extent of the flowage rights, except to find that the present level of the Pond does not result in flowage beyond the flowage easement.

" The Master recommends:

1. The plaintiff's petition be dismissed.

2. That the plaintiff be ordered to remove the fence which is presently situated on land of the defendants.

3. That defendants' request for damages be dismissed. "

The case involved the interpretation of numerous deeds in the light of all the circumstances ( *North Hampton District* v. *Society,* 97 N.H. 219, 84 A.2d 833 ( 1951 )), including the practical construction of the instruments by the various parties. *Essex Co.* v. *Gibson,* 82 N.H. 139, 130 A. 846 ( 1925 ); *McCleary* v. *Lourie,* 80 N.H. 389, 392, 117 A. 730, 732 ( 1922 ); *see*

*Bogosian* v. *Fine,* 99 N.H. 340, 111 A.2d 190 ( 1955 ). As so often happens, the deeds themselves were not all models of clarity. In this situation, the view, which may have furnished vital portions of the evidence, assumes added significance. *Gelinas* v. *Portsmouth,* 97 N.H. 248, 85 A.2d 896 ( 1952 ). The interpretation of deeds is ultimately for this court. *Hogan* v. *Lebel,* 95 N.H. 95, 58 A.2d 321 ( 1948 ); *Kennett Corporation* v. *Pondwood Co.,* 108 N.H. 30, 226 A.2d 783 ( 1967 ). However, subject to review, the master could properly find what he believed to be the intent of the parties. *Hogan* v. *Lebel supra.*

Much of the testimony relating to long-past events resulted in contradictions. It is axiomatic that such were for the trier to resolve. *Clover &c.* v. *Smith Co.,* 96 N.H. 491, 79 A.2d 8 ( 1951 ); *Lester* v. *Lester,* 109 N.H. 359, 252 A.2d 429 ( 1969 ). His task was to select what he believed to be the truth and in so doing he did not have to accept even uncontradicted testimony. *Bill* v. *Company,* 90 N.H. 453, 10 A.2d 662 ( 1940 ); *see Dustin* v. *Lewis,* 99 N.H. 404, 112 A.2d 54 ( 1955 ). It follows that the plaintiff's arguments that the court was bound to find or not to find this or that fact cannot prevail. *Dustin* v. *Lewis supra.*

One of the positions taken by the plaintiff is that RSA 482:17 compelled a finding that whatever flowage rights the defendants had were lost by abandonment. RSA ch. 482 is entitled " DAMS AND FLOWAGE. " Section 17, with the subheading " Conflicting Claims, " reads as follows: " The provisions of this subdivision shall in no way affect any mill of other persons lawfully existing on the same stream, or any mill site or mill privilege of other persons on which a mill dam has been lawfully erected and used, or the right of any owner of such mill, mill site or mill privilege, unless the right to maintain on such last mentioned site or privilege shall have been lost or defeated by abandonment or otherwise, and non-user of any mill site or mill privilege for a period of six years shall be prima facie evidence of abandonment; nor shall they affect any flowage or other water rights heretofore acquired, or the right to maintain any dam heretofore constructed. "

This statute does not purport to determine rights between parties but relates solely to the necessity of application to the Water Resources Board in the event of abandonment. RSA 482:19. In any event the evidence here did not require a finding of

abandonment. There was a long history of the water being maintained at an even higher level than existed at the time of the trial. Evidence was presented that prompt repairs were made to the dam in 1946 and again after it was washed out in 1956, and it appeared that at times the pond had been utilized by the defendants or their predecessors for recreational purposes. These and other circumstances negate the plaintiff's claim that there had been an abandonment under RSA 482:17 of the defendants' rights.

Plaintiff appears to argue that the right to flow the pond area was acquired by defendants' predecessors in title for the purpose of operating a mill and their flowage rights could not be maintained for any other purpose. No authority has been cited for this statement and we know of none. On the contrary it is well established that an easement may be maintained for a purpose not contemplated when it was created. *Whittier* v. *Winkley*, 62 N.H. 338 ( 1882 ); *Sakansky* v. *Wein*, 86 N.H. 337, 169 A. 1 ( 1933 ).

The plaintiff has rested his case on non-use or abandonment of defendants' flowage rights. While the master could properly find as he did, that defendants had not lost the rights by non-use he further pointed out that plaintiff had failed to establish either by deed or prescription any title to the land flowed. This latter finding was required by the evidence and is fatal to plaintiff's case. *New England Box Co.* v. *Wood*, 81 N.H. 124, 123 A. 826 ( 1923 ); *Rosenblatt* v. *Kizell*, 105 N.H. 59, 192 A.2d 613 ( 1963 ); *Ucietowski* v. *Novak*, 102 N.H. 140, 152 A.2d 614 ( 1959 ).

In regard to the position of the fence erected by the plaintiff, which the defendants assert was on Hutcheson's property, the testimony was conflicting and unclear. However, we are satisfied that the record as a whole sufficiently supports the finding that the fence was on the land leased by the defendant owner Hutcheson to the defendant lessee Hubbard, and therefore the order to remove it was proper.

In summary, a search of the entire record discloses no errors in the master's conclusions. *Hogan* v. *Lebel*, 95 N.H. 95, 58 A.2d 321 ( 1948 ). The order is

*Decree affirmed.*

GRIMES, J., concurred specially.

GRIMES, J., *concurring specially*:
I concur in the result in this case on the sole basis that the plaintiff, having no title to any of the land being flowed, has no standing to complain.